Cooper *v.* Carlisle et al.

The decree of the Chancellor was affirmed by the following vote:

*For affirmance*—BEASLEY, C. J., BEDLE, CLEMENT, CORNELISON, DALRIMPLE, ELMER, HAINES, KENNEDY, VREDENBURGH, WALES, WOODHULL. 11.

*For reversal*—NONE.

---

# JUNE TERM, 1866.

NATHAN A. COOPER, appellant, and ELIZA CARLISLE and others, respondents.

1. It is settled, that in equity, part performance will, in certain cases, take contracts out of the provisions of the statute of frauds, requiring them to be made in writing.

2. Courts will not extend their exceptions further than established by decisions, but are disposed to enforce the statute as wise and salutary in its effects.

3. In order to take any contract out of the statute of frauds, by part performance, it is required. 1. That the parol agreement be clearly proved. 2. That the contract be clear, definite, and certain. 3. That the contract and remedy be mutual. 4. That the complainant be not in laches, either in bringing suit, or offering to perform his part.

4. Unsupported parol evidence of conversations with a deceased person, made seventeen years after the conversations took place, is not satisfactory proof of a contract, to sustain a suit for specific performance.

5. The owner of lands along a stream above a dam, said, in conversation with a mill-wright engaged in raising the dam, that if the owner of the dam would pay him as he had paid H, he might overflow his whole farm. This was not an agreement to convey the right to overflow the land at the rate per acre paid to H.

6. Although it may be held in some cases that a unilateral contract, or contract by which one party is bound to convey, and the other not bound to purchase, may be made mutual by filing a bill offering to perform, so as to give a right to specific performance, yet on such contract, more prompt-

ness, both in offer to perform and in bringing suit, is required, than where the contract is mutual. A delay of fifteen years, or until the value of the property, or the rights of the parties, have materially changed, will bar the suit.

7. That the owner of lands above a dam, stands by and sees the dam raised without objection or protest, is not such acquiescence as will bind him, if he does nothing to induce or encourage such raising; especially, if at the time, he does not know whether it will cause his lands to be overflowed, or will be used by the owner for that purpose without first purchasing the right to overflow.

This was an appeal from a decree of the late Chancellor. The facts of the case appear in the opinion of the court.

*Mr. Vanatta* and *Mr. McCarter,* for appellant.

*Mr. Pitney* and *Mr. C. Parker,* for respondent.

The opinion of the court was delivered by

ZABRISKIE, C. The appellant, Nathan A. Cooper, filed his bill in Chancery, as complainant, against the respondents, for two objects: one of which was to compel the specific performance of a contract to convey lands, or an easement of overflowing them; the other to enjoin a suit at law, commenced by the respondents against him for overflowing land, and all future suits, on the ground that the overflowing was done, and the dam and works that caused it were erected, by the license and acquiescense of Thomas M. Carlisle, now deceased, from whom the respondents derive title, as devisees.

The case stated in the bill is this:

Nathan Cooper, in 1825, purchased a mill site on Black river, in the township of Chester, in the county of Morris, with mill-dam, and a saw and grist mill; in 1827 he rebuilt the mill, and in that year and in the year 1829, he raised the height of the dam as it stood until 1846. He died in 1834, having by will devised this mill property in fee to the complainant, his nephew. On the 24th of November, 1845, the complainant purchased of the heirs of Caleb Horton, de-

Cooper *v.* Carlisle et al.

ceased, about nine acres of land on said river above his dam, which the owners for years before, had complained was wrongfully overflowed by reason of said dam being too high. The price paid was forty dollars per acre.

In 1846, the complainant repaired his mills, his tumbling dam, raceway trunk, and flume. The bill of complaint alleges that Vandoren, the complainant's mill-wright, suggested to him that it would be useful to raise the dam; that on consultation, it was thought that this might cause back-water upon a very little of the land of Thomas M. Carlisle. That the complainant, for this reason, hesitated about raising the dam, lest it might overflow the land of Carlisle, who owned a farm on Black river, some distance above the dam. That shortly afterwards, Carlisle came to the dam, where Vandoren was at work, and Vandoren said to him, "we talk of raising this dam some, and what if it causes the water to flow on your land?" to which Carlisle answered, that if Cooper would pay him as well as he paid the Horton's, he, (Cooper,) might flow all of his farm. That in a few days after this conversation, Vandoren told it to Cooper, and Cooper, believing from it that Carlisle had no objections to increasing the height of the dam, and that if he should, by raising the dam, overflow any of Carlisle's land, he would convey it to him at the rate of forty dollars an acre, consented that his mill-wright might raise the dam. This is the contract of which specific performance is sought, as set forth in the bill.

After this, while Vandoren was engaged in raising the dam, Carlisle came there and inquired how much he was going to raise the dam, to which Vandoren replied, that he would raise it the thickness of the stick of timber on which he was then working, the thickness of which was nine inches, and which Vandoren measured in Carlisle's presence, who did not object to the raising of the dam, or the proposed height of nine inches, but said " well, Cooper is good enough.'

Carlisle saw the workmen raising the dam, in passing and repassing, and did not interfere or object: after it was raised, on several occasions, Carlisle asked the tenants of Cooper to

raise the floodgate of the dam, when the water in the river was high, so that he could gather his hay; this was requested as a favor, not demanded as a right.

The bill further alleges that Carlisle did not complain to Cooper of back-water on his land, though on one occasion he asked him to pay him something for injury done to his his land by the back-water, or to come and see about it, but in such manner that Cooper did not attend to it, and says in his bill, under oath, that he did not then remember it; but only had an indistinct recollection or impression of it, and that he had never otherwise heard or supposed that the dam caused any back-water upon, or damage to, Carlisle's lands. That, after such consent, Cooper raised his dam not more than nine inches, and placed new machinery in his mill, adapted to such increased height, and expended thus, from fifteen hundred to two thousand dollars. That after Carlisle's death, in 1855, and in the year 1857, Eliza Carlisle, his widow and devisee for life, told Cooper that the back-water was injuring her lands, and requested him to see about it. That he examined and found it was so, and entered into negotiations with her about it, which were continued without result, until January, 1861, for nearly six years, when she, with her children, who are the respondents, brought suit at law for the damage, which suit at law was restrained by the injunction in this cause.

The bill prays a perpetual injunction against suits for raising the dam, or damages by overflowing, and that the defendants may be compelled to convey to the complainant, Cooper, so much of the land as is overflowed by the dam as raised, or the right to overflow the same, upon his paying such compensation as, under the circumstances, shall be equitable and just.

The answer of the defendants denies, from information and belief, any agreement or consent by Thomas M. Carlisle, in his life, to convey the land, or to the raising of said dam, and sets forth frequent demands on the complainant for redress and compensation; and insists that, in answer to said demands, and in the negotiations about settlement, he

never set up or pretended that the dam was raised by agreement with or consent of T. M. Carlisle.

The complainant thus claims relief on two grounds. The first is that Carlisle made a contract with him to convey to him the lands which should be overflowed by the raising of his dam, at the price of forty dollars per acre; and that he, having expended money in part performance of that contract, by raising his dam and enlarging his works, is entitled to have the same performed, and to a conveyance of the land so overflowed, although the contract was not in writing. The second ground for relief is, that as the dam was erected and the works enlarged by the license, and with the knowledge and acquiescence of Carlisle, the license cannot now be revoked, and he is entitled to have a perpetual injunction against interfering with works erected with his knowledge and acquiescence.

It is now well settled that, notwithstanding the plain words of the statute of frauds, courts of equity will compel the specific performance of parol contracts, where they have been in part performed or executed, in cases where such part performance would work a fraud, if the contract was not fulfilled. 2 *Story's Eq. Jur.*, § 759, 761; *Fry on Spec. Perf.*, p. 174, § 383, &c.

The wisdom of the statute of frauds, in this respect, has been manifested by the many doubts and difficulties arising from this departure from it, and is further shown by the painful uncertainty of the parol evidence in this very case, and I fully agree with Chancellor Kent in his observations in *Phillips* v. *Thompson*, 1 *Johns. Ch. R.* 149. "This case, like many others, shows the great utility of the statute of frauds, and the danger of relaxing the sanction of its provisions; I agree with those wise and learned judges who have declared that the courts ought to make a stand against any further encroachment upon the statute, and not to go one step beyond the rules and precedents established." See also *German* v. *Machin*, 6 *Paige* 293; 1 *Story's Eq. Jur.*, § 765.

Now, to this established doctrine of the courts of equity, that part performance will take a parol contract to convey lands, out of the statute of frauds, there are certain limitations which are as well settled as the doctrine itself. We are not willing to carry the doctrine beyond these established limitations. Among these it is established: 1. That the parol agreement must be clearly proved to the satisfaction of the court. *Phillips* v. *Thompson*, 1 *Johns. Ch. R.* 149; 1 *Story's Eq. Jur.*, § 764; *Smith* v. *Mc Veigh*, 3 *Stockt.* 239. 2. The contract proved must be clear, definite, and certain, both as to its terms and subject matter. 1 *Story's Eq. Jur.*, § 764; *Ld. Stuart* v. *London & N. W. Railway Co.*, 1 *De Gex, M. & G.* 721. 3. That the contract and remedy in this, as in all other cases of specific performance, must be mutual. 1 *Story's Eq. Jur.*, § 723; *Fry on Spec. Perf.*, § 286; *Benedict* v. *Lynch*, 1 *Johns. Ch. R.* 370; *German* v. *Machin*, 6 *Paige* 288; *Bronson* v. *Cahill*, 4 *McLean* 19; *Smith* v. *Mc Veigh*, 3 *Stockt.* 239. 4. The complainant must not be guilty of laches, either in offering to perform his part or in bringing his suit. *Fry on Spec. Perf.*, § 730; 1 *Story's Eq. Jur.*, § 771; *Milward* v. *Earl Thanet*, 5 *Vesey* 720, (*b*); *Eads* v. *Williams*, 4 *De Gex. M. & G.* 691; *Heaphy* v. *Hill*, 2 *Sim. & Stu.* 29.

With regard to the proof, the mere lapse of time where the contract is denied by the answer, as it is here, makes mere unsupported parol proof, taken seventeen years after the conversations to which it relates, unsatisfactory. Vandoren proves the conversation with him, as set forth in the bill, substantially, and that upon his telling Cooper what Carlisle had said, Cooper gave directions to go on with the work, and raise the dam. This conversation with Carlisle by Vandoren, is the contract on which the bill was filed, and, if we believe the statements in the bill sworn to by the complainant, and the evidence of Vandoren, it is the contract on which the dam was raised. Of this contract or conversation, it is enough to say, that it does not, in law or in equity, amount to a contract on which a suit can be based or defended. It is a mere statement by Carlisle, upon inquiry,

Cooper *v.* Carlisle et al.

that he would be willing to sell the whole or part of his farm, at the price paid the Hortons. It proceeded no further, it was not even an unaccepted offer, and if the court was willing to grant relief upon a contract, proved by recollections of conversations at the end of seventeen years, this conversation amounts to no contract, and no relief could be given.

But another contract is attempted to be proved by James H. Douglas, made by conversations with him on different occasions about the time of repairing the dam. The contract is about the same subject matter, but it is a different contract. It might be sufficient to say with regard to it, that no relief could be granted on this contract, upon this bill. It is as if in a bill of foreclosure, a mortgage was set forth, void on its face, for usury, or want of stamp, or some other cause, and there should be offered in support of the bill another mortgage, of different date, payable at a different time, free from these defects, but given for the same money; it is clear, this would not be merely a variance but a different contract, and no relief could be had in that suit. But the relief in this suit would not be granted if the bill had set out the Douglas contract, because the court are not satisfied with the proof. It is a contract, the efficacy of which depends entirely upon the accurate recollection by the witness, of the words of the conversations in which it was alleged to be made. It is proved by a witness, who was a mere tenant of the mill, who had been absent from the state for seven years, and from the premises much longer, and had had nothing to recall the affair to his memory. Few men could recollect a conversation at all, very few, I may say none, without a memory such as would constitute a prodigy, could remember it with any accuracy of detail, for this length of time, without the aid of some memorandum or other matter to refresh and support the memory. That he remembered several different conversations, which together supply precisely all that is necessary to make a contract, is suspicious, but alone would not be sufficient to impeach his credit. The fact that he was discovered and sworn on an accidental visit from the west, a year after

the complainant had seemingly rested his testimony, is suspicious, too, but may be explained. But besides the improbability of recollecting these conversations at this length of time, great doubt is thrown over this testimony by two facts; the first, which appears by the bill and the complainant's evidence, is this, that the complainant, at the complaints in Carlisle's life, and in the negotiations with his widow after his death, and above all, in his instruction to counsel at the filing of his bill, had forgotten that any such agreement was made. It appears to me impossible that Cooper could have forgotten it, if it had been made in the manner stated by Douglas, he, Cooper, having had continually, for years, so many complaints that would have recalled it to his mind. He went on negotiating about thirty dollars a year, entirely forgetting that he had a contract for the whole, at forty dollars per acre; he never once mentioned it before filing this bill. The second fact is, that the defendant, Eliza Carlisle, never heard her husband in his lifetime, mention this agreement, though she heard him complain of the overflowing of the water, both to Cooper and in his absence; her answer on this is fairly responsive to the bill, and is evidence. The wife of a farmer of moderate circumstances, who has her husband's confidence, as Mrs. Carlisle had, judging from his will, is usually told of the bargains and changes made by her husband about the farm, and could in a case like this hardly forget it. We think it more probable that both these witnesses, and especially Douglas, in their efforts to recollect the particulars of conversations on a matter that they had doubtless heard talked of, by one or both parties, or at second hand, are mistaken, than that the complainant should have forgotten it for sixteen years, and Mrs. Carlisle entirely. Again, these two witnesses were present at the raising of the dam in 1846. Douglas swears that the sill of the dam was raised nine inches, and in this he is supported by Axtell, the mason who repaired the wall, and laid the stone on which that sill was then placed. Vandoren swears that the sill was not raised, and in this he is supported by Crater, who helped

Cooper *v.* Carlisle et al.

him put that sill in its place. This matter of fact, in which they all took part, and saw with their eyes, and which was the material fact in the alteration, witnesses would be expected to recollect, when they could not accurately remember conversations, or the words used in them; yet about this fact the two witnesses relied upon to prove the two contracts differ, and contradict each other. I have no doubt they differ in good faith, and that the one with Crater believes that the sill was not raised, and the other believes with Axtell that it was. But we cannot rely on either at this distance of time, to recollect with accuracy, a parol contract set up against the provisions of the statute of frauds.

Secondly: This contract is uncertain, both as to the price and as to the land. Vandoren says, as to the price, Cooper was to pay as well, or as liberal, as he had paid the Hortons for their land. What does this mean? the same price per acre, or the same price in proportion to the value? The most natural meaning of *liberal* would be the latter. Douglas says, "what he gave the Hortons for their land;" does this mean the same price per acre, or the same gross sum for the part wanted? A good argument might be made on either side of this question. The same uncertainty rests on the quantity of land; according to some of the witnesses, the dam was raised only nine inches; according to others it was raised much more, and some of the testimony would make it thirty-one inches. Was the contract to convey as much land as a raise of nine inches would overflow? or as much as the height to which he might then raise it, or prepare to raise it, would overflow? How much land did complainant overflow? The bill does not set it forth, or describe it, but intends to leave the court to grope after it, and find it out. And if the contract was not, on its face, uncertain as to its construction, and admitting, what is undoubtedly a correct and settled principle, that when the land is defined, the court will have the metes and bounds settled and ascertained, and the quantity calculated, yet in this case, from the uncertainty of the testimony as to what was the height of the dam in 1846, as used with loose

2 Y *

boards, and what was the height to which it was raised, it would be practically impossible to arrive at any satisfactory result as to the quantity overflowed.

As to the mutuality. By the agreement set forth in the bill and proved by Vandoren, the complainant was not bound to anything. By the contract, proved by Douglas, he agreed to pay for what he overflowed, but did not agree to overflow or purchase any. Upon the doctrine established in many cases, that an optional or unilateral contract is made mutual by the filing of the bill asking for a conveyance, the Douglas contract would be relieved from the want of mutuality, were it not that the bill does not settle or define how much land it accepts or offers pay for, and that the time elapsed before the filing of the bill, fifteen years, far exceeds the *reasonable time* allowed a purchaser to accept an optional contract.

But the laches of the complainant, both in offering to perform his part of the contract, and in filing his bill, is a full and complete bar to relief in equity, if there were no other. There is no reason given for the delay. The excuse offered that the complainant was too much engaged with other matters, is not only frivolous of itself, but the very offer shows that there was no other reason for the delay. It was a case that required prompt and immediate action; it was an unilateral contract, which, more than others, requires promptness; and the option, as to how much he would overflow by raising his dam, was with him. He knew whether the sill was raised nine inches, whether the cap piece was raised nine inches more, how wide were the boards on the old sill, and above all, of what width he intended to use boards on the new sill. It was his duty, as soon as he had fixed his dam as he wanted it, to ascertain by survey and accurate experiment, whether he raised the water at all, and, if any, how much, on Carlisle's land, and how much land he wanted. Had he delayed this a year, there might have been a question whether he was not too late. In other contracts, not so peculiarly optional and unilateral as this, two years' and three years' delay have been held too long. And in no case brought

to our attention, has a delay so long as this, where the contract on the part of the complainant was wholly unperformed, been overlooked, even with reasons accounting for it.

In this case, the complainant has waited until Carlisle, who made the contract, was dead. The answer was important his responsive oath would have neutralized and destroyed the testimony of Vandoren and Douglas, if he denied their alleged agreements. He has waited until the raising of the dam in 1829 has ripened into a right, and the starting point from which to measure the increase of overflow might be different. The value of land might be, and probably is, very different. And the evidence, by which it must be ascertained how much land is overflowed by the raising of the dam, is difficult to procure, and uncertain and unsatisfactory in its results.

The second ground on which the plaintiff seeks relief, (license and acquiescence on part of T. M. Carlisle,) cannot avail him here. The evidence, however uncertain, shows that the complainant inquired of Carlisle whether he would sell him the land, if it should turn out that the raising of the dam should overflow any of it. There was no license pretended by the complainant's bill or evidence, except such as was included in a contract or offer to sell; it was not intended, nor was it in terms, a license to overflow Carlisle's land. The doctrine of acquiescence has no place in this cause; Carlisle saw the dam being raised, but did not, by his acts or silence, deceive the complainant as to his right to erect it. He did not, as the cases require to constitute acquiescence, encourage him in it, inducing him to think that he would not complain of any injury. On the contrary, he was made to believe that it was very doubtful if the raising of the dam would do him any injury, and that if it did, Cooper would pay a satisfactory compensation. To the raising of the dam, he had not the right to object; to the flowing of his land, he had; but he did not know that it would be overflowed by the raise of nine inches, nor does it appear that it was; Cooper alleges in his bill that he supposed, during the life of Carlisle, that "said dam did not do any damage to any of

the lands of said Thomas M. Carlisle." Under these circumstances, no acquiescence could bind.

We are of opinion that the appellant was not entitled to any relief, and that the decree of the Chancellor dismissing his bill, should be affirmed.

The decree was affirmed by the following vote:

*For affirmance*—THE CHANCELLOR, BEDLE, CLEMENT, ELMER, HAINES, VAIL, VREDENBURGH, WALES, WOOD.    9.

*For reversal*—CORNELISON, KENNEDY.    2.